**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**Cr. No. 10-32(2) (JNE/SRN)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S POSITION AS TO** |
| | ) | **SENTENCING AND SENTENCING** |
| | ) | **MEMORANDUM.** |
| | ) | |
| vs. | ) | |
| | ) | |
| STEVEN J. LEACH, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

In the post-*Booker* world, and perhaps as a nod to the limitations of guideline sentencing as a whole, the sentencing judge's consideration of the appropriate sentence no longer ends after applying the various guideline adjustments to the base level offense, calculating the defendant's criminal history score, and locating the point on the grid where the two calculations meet. That rigidly scripted process of arriving at a federal sentence, which endured for almost 20 years, has been irreversibly altered. In the words of the Court in *Rita*, the "wholesale sentencing" from the days of rigid guideline application  has given way to the "retail" sentencing that is now possible as a result of this sea change in sentencing law. A sentencing judge may now consider a myriad of facts in determining what sentence she should impose that is consonant with the statutory purposes of sentencing that guide her sentencing discretion.

Against this change in the landscape of federal sentencing comes this defendant, Steven J. Leach.  Mr. Leach has one objection to the guideline calculations as set forth in the presentence report completed by U.S. Probation Officer Brad Smith.  Mr. Leach believes that the probation officer incorrectly determined that Mr. Leach was an average participant when in fact a minor role adjustment is appropriate for those reasons set forth in the plea agreement.

Furthermore, Mr. Leach believes that a sentence of five years of probation would be a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing outlined in 18 U.S.C. § 3553 and that such a sentence would fully effectuate Congress' explicit directives to courts in imposing a statutorily reasonable sentence.

For the reasons that follow, Mr. Leach, by and through his attorneys, Robert D. Sicoli and Sarah M. MacGillis, asks this court to sentence him to a sentence of five years of probation with conditions and restitution.

## FACTS

The statutes that inform this court's sentencing discretion direct consideration of the history and characteristics of the defendant as well as the facts of the offense. Accordingly, an abbreviated history of Mr. Leach's background is set forth for this court's review as well as a brief recitation of those facts established by the record of this matter.

PDF created with pdfFactory trial version www.pdffactory.com

## STEVEN LEACH'S BACKGROUND

Steven Leach is the most unlikely of criminal defendants. He grew up in a large family of eight; he has four sisters and one brother. They were all raised in a loving household in Bloomington, Minnesota by his parents Bill and Betty Leach, who have been married for over 56 years. They remain close and communicate on almost a daily basis. Each member of his family has written directly to this court to express their individual opinion of Steven Leach. His entire family will be present at his sentencing before this court as a tangible demonstration of their love and support for him.

Mr. Leach followed in his parents' footsteps in choosing his life partner. He has been married to his wife, Debbie Leach, for 28 years (and counting). As a neighbor and long-time friend of the Leach's observed: "Steve and Debbie are pretty much one and the same." (*See* Ex. 1, letter of Paul and Jan Griebel).[1] During their marriage, they wove two separate histories into a single loving tale punctuated three times by children, Christie, Stephanie, and Michael. Christie, who is 27 years old, is a first grade school teacher in the Twin Cities. Stephanie, who is 25 years old, works in marketing at a market research firm, and is getting her Masters degree in business from St. Thomas University. Mike is a 22 year old senior at the University of St. Thomas majoring in business.

Debbie Leach has told this court that her husband was and is the ultimate family man. According to Debbie Leach, her husband never missed a conference, recital, play

---

[1] All character letters have been sent directly to this court at the time of filing this Sentencing Memorandum. Those referenced within this memorandum have been marked as exhibits to facilitate the court's ability to easily identify a letter being discussed.

PDF created with pdfFactory trial version www.pdffactory.com

or sporting event because he would schedule his work around the kids' schedule, not try to fit their events in when his work schedule permitted.   His commitment to his children was well known by others who admired his dedication and demonstrated sense of priorities.   Indeed, of the more than 100 letters sent to this court, almost every single writer knew of Mr. Leach's whole-hearted involvement in his family's life.   Even Mr. Leach's employees knew what nights were dedicated to Mr. Leach's family commitments and knew that he would be unavailable for work, meetings, or travel.  (*See* Ex. 2, letter from Kathleen Osterhus).

Mrs. Leach also described Mr. Leach's volunteer service in youth sports.   She observed that her husband was a volunteer coach in basketball, softball, baseball, and volleyball for more than 15 years, dedicating thousands of hours in volunteer service to children's sports teams.   (*See* Ex. 3, letter from Debbie Leach).  In that role, he not only coached young boys and girls teams, he served as the principal organizer, scheduler, fundraiser, gopher, and ride coordinator for dozens of teams over multiple years.

Mr. Leach's children have also written directly to this court to express their admiration for their father's selfless commitment to them throughout their lives.  In those letters, they expressed an unwavering attitude that their father felt, and consistently *acted like* his family was the most important thing to him throughout their entire lives.  His daughter wrote to this court about how she never had to wish her father was at an event or there when she needed him because he was always there, "coaching us, encouraging us, and supporting us in any way that he could."  (*See* Ex. 4, letter of Stephanie Leach).  His son wrote about his admiration for his father's "family first" value and his unbridled

PDF created with pdfFactory trial version www.pdffactory.com

loyalty and commitment to be present to meet the needs of his family. (*See* Ex. 5, letter of Michael Leach).  His other daughter, Christie, observed her appreciation for the effort behind her family's "unbreakable family bond" as well as her hopes of replicating Mr. Leach's parenting skills in her own family one day.  (*See* Ex. 6, letter of Christine Leach). Steven Leach is a man who has modeled exceptional parenting throughout the lives of his children.

Steven Leach has always been a hard worker.  After a stint as a paperboy at age 11, he held his first "real" job starting at age 13.  He worked for the Minnesota Twins and Minnesota Vikings selling souvenirs at a stand, a job he held for nearly 20 years--until he was 32 years old.  He even solicited his then girlfriend Debbie into the sale of game programs prior to their marriage.  He used the proceeds from that first job to pay for his own college education at St. Cloud State University and make a down payment on his and Debbie Leach's first house. He has continued to work full time his entire adult life financially supporting his family.

He has been a caring and committed husband to his wife Debbie.   Debbie Leach has told this court that her husband has always put her needs, and the needs of their children before his own.  She observes that she has long suffered from debilitating migraine headaches that have made it difficult, at times, to care for their children as well as largely impossible to sustain employment.  Her physician has verified her present medical condition as well as her inability to sustain continued employment.  (*See* Ex. 7, letter of Dr. Maltin Repishti).

PDF created with pdfFactory trial version www.pdffactory.com

Steven Leach has led an honorable life in which he has been a committed friend, neighbor, coach, and employer to a large number of people who have written directly to this court to express their love and admiration for him in detailed letters.  As such, he has given generously of his time, his spirit, and his personal wealth with no expectation that life, or a district court judge, would someday show him a reciprocal kindness.

They have shared stories and made observations regarding Mr. Leach's actions within their shared community and told this court what kind of person he is.  From those letters, we have learned that Steven Leach is the kind of volunteer who has given thousands of hours in service for more than 15 years coaching and directing youth sports. (*See, e.g.,* Ex. 8, letter of Michael McGuiggan).  He is the kind of coach who when he noticed that an inner city's team's players were playing without proper basketball shoes, organized a drive to get shoes donated to their organization.  (*See* Ex. 9, letter of Janine and Scott Olson).  He is the kind of boss who would close his office for an employee's family member's funeral so that everyone could attend and then pay for the funeral expenses without telling anyone.  (*See* Ex. 2, letter of Kathleen Osterhus).  He is the neighbor who became Santa year after year organizing caroling and sleigh rides for the children in his neighborhood while donning a red suit and black boots.  (See Ex. 10, letter of Rick Lessnau; Ex. 11, letter of Mike Nanne).  He is the kind of parishioner who in the midst of his own life-changing problems, worked to find housing for an Ecuadorian family who were new to the area.  (*See* Ex. 12, letter of Gary Hilgers).  He is the kind of man who others repeatedly describe as compassionate, a good listener, and a one-of-a-kind friend—and they mean it.  (*See,* e.g., Ex. 13, letter of Jenna Quam; Ex. 14, letter of

PDF created with pdfFactory trial version www.pdffactory.com

Kathryn All; Ex. 15, letter of Patrick and Sharon O'Toole; Ex. 1, letter of Paul and Jan Griebel; to name just a few).  He is the friend who many would call in the middle of the night with upsetting news and know that he would be there to listen, (*see* Ex. 16, letter of Michelle Sandquist), or that one would choose to take care of their children if they couldn't do so.  (*See* Ex. 17, letter of Greg and Mary Beth Senske).

Steven Leach is, perhaps, the most improbable of criminal defendants.


## THE OFFENSE CONDUCT

The "official version" of the offense conduct is set out in the plea agreement and at length in the presentence investigative report.  But there is more, as there often is, that this court should consider.

Steven Leach was a loyal employee of Dennis Hecker, and perhaps, myopically so.  Like any number of individuals who have been interviewed regarding their employment with Dennis Hecker, Steven Leach toed the line and did what he was told to do in the face of Hecker's many demands delivered in a commanding voice.  The fact that "Denny Hecker would do what Denny Hecker would do," was a truism as well understood as that the sun would rise in the East.  It is almost impossible to believe that Steven Leach would be sitting before this court today had his life not intersected with Dennis Hecker's; he did not seek out a crime, it came to him.  That regrettable intersection, however, provided the setting for this criminal prosecution and for that Mr. Leach is full of regret.

PDF created with pdfFactory trial version www.pdffactory.com

As part of this fraud and simplifying it for purposes of this memorandum, Hecker ordered Mr. Leach and several other employees to remove the incentive page that was part of the Suzuki contract before sending it to Chrysler Financial in conjunction with obtaining financing on a small number of Suzuki vehicles in 2007.  Later in 2007, Mr. Leach was again pressed into service by Hecker.   At Hecker's behest, Mr. Leach helped him in Hecker's plan to fraudulently obtain financing from Chrysler Financial on a large number of Hyundai vehicles.  On November 15, 2007, Hecker asked Mr. Leach to get Hecker's secretary to make Hecker's handwritten changes to a sales contract Hecker had with Hyundai and fax them to him in Detroit where Hecker would be meeting with individuals from Chrysler Financial to obtain financing on those Hyundais.  The changes that Hecker made did not in any way comport with the reality of the sale and Steven Leach understood that.   Nonetheless, Mr. Leach did what Hecker asked him to do, although unquestionably, he should not have done so.

But Steven Leach, unlike Dennis Hecker and many of his other uncharged co-conspirators, experienced a change of heart.  He met with Mr. Hecker on December 4, 2007, slightly more than two weeks after Mr. Hecker submitted the false document to Chrysler Financial in conjunction with obtaining financing on those Hyundai vehicles. During that meeting and according to the statements of persons who were present[2], Steven Leach implored Mr. Hecker who had simultaneously denied and then admitted to providing the documents to Chrysler Financial, to reverse the course he had commenced

---

[2] The facts describing the events of December 4, 2007, were derived from law enforcement interviews of Erik Dove and Dick Page.

PDF created with pdfFactory trial version www.pdffactory.com

or Leach, and another employee, would be forced to resign.  According to those same persons, Leach provided Dennis Hecker with the true and correct Hyundai contracts and asked Dennis Hecker to make it right with Chrysler Financial.  Hecker was unmoved to change his ways. He asked Leach to wait it out and give him time to fix things.  He accused Leach of putting a gun to his head by virtue of his demand to change course immediately.  Hecker asked him to hold steady until Hecker could figure things out.  This time, it was Steven Leach who was unmoved:  he did the right thing and he quit his job at Rosedale Leasing at the conclusion of this meeting.

Before the end of 2007, he fully severed his ties to Hecker.  He did this not because an investigation was underway and discovery of his criminal acts were inevitable.  Nor did he undertake this course of action to avoid detection—if anything, his sharp exodus served only to draw attention to him.  Steve Leach's change of heart originated in him and was a reflection of his genuine regret for having engaged in any criminal conduct and his absolute disagreement with Hecker's refusal to make it right during the December 4th meeting.

The fact that Hecker was unmoved to change his ways is a significant fact for this court to consider.  Based on the information contained in the discovery provided by the government and information contained in the pre-sentence investigative report, Hecker quickly found other employees of his companies to assist him in his efforts to fraudulently obtain financing on vehicles for his company; individuals presently not charged with any criminal offense.  The fraud continued long after Steven Leach was removed from the diagram setting forth the Hecker organization employees.  It is,

PDF created with pdfFactory trial version www.pdffactory.com

incidentally, undisputed that Steve Leach did not profit from this fraud.  He did what he did simply because his boss asked him to do it and he lacked the courage and the foresight to say "no."

## <u>Objection  to the Probation Report</u>

The defendant has a single objection to the presentence report prepared in the instant case by U.S. Probation Officer Brad Smith.  Mr. Smith concluded that Steven Leach is an average participant in the offense, a determination that is at odds with this relatively complicated fact-laden case.  The government, who is in the best position to understand the facts of this case and the role of Mr. Leach's unindicted co-conspirators, acknowledged as much in agreeing that Mr. Leach was a minor participant.  The government was justified in its belief.  Steven Leach is, in fact, a minor participant as set forth and described in the plea agreement.

A defendant is entitled to a two-level reduction for a mitigating role in the offense of conviction when although playing a role in the commission of the offense, the defendant's "culpability for such conduct was relatively minor compared to that of the other participant or participants." *United States v. Monk*, 312 F.3d 389 (8th Cir. 2002), *citing  See* U.S.S.G. §3B1.2.

The government and the defendant agree that this mitigating role adjustment applies for three good reasons.  First, Mr. Leach's involvement with the conspiracy was short-lived in comparison to others who were involved in this conspiracy and ended when he quit his employment in late 2007.  Following Mr. Leach's exodus from the Hecker

PDF created with pdfFactory trial version www.pdffactory.com

organization, others, including Mr. Hecker, James Gustafson, and other unindicted co-conspirators, continued to engage in fraudulent conduct in 2008 and 2009 including, but not limited to, obtaining re-financing by fraudulent means of the Hyundai vehicles, obtaining financing on Suzuki vehicles by fraudulent means in 2008, and other conduct intended to cover up and conceal these fraudulent acts.  The duration and extent of the conduct of others individuals involved in the conspiracy eclipse that of Leach and a role adjustment is appropriate.  *See United States* v. Fares, 95 Fed.App'x. 379 (2d Cir. 2004).

In *Fares*, for example, the defendant received a minor role adjustment when his conduct occurred over approximately 120 weeks, involved depositing hundreds of checks on behalf of the conspiracy, and where he personally opened two bank accounts through which approximately $5 million was laundered. *Fares*, 95 Fed. App'x. at 383-84.  *See also United States v. Aluko*, 989 F.2d 20, 22-23 (1st Cir. 1993)(considering duration and scope of acts of individual defendant in assessing propriety of role adjustment and granting no reduction for criminal acts that spanned more than a year and only stopped because of arrest and involved at least ten fraudulent claims).  Here, Mr. Leach's conduct cannot be construed as anything other than minor when compared to the extensive criminal conduct that post-dated his exodus from the Hecker organization.  That criminal conduct endured for almost another 1½ years and ended only because the fraud was discovered.

Second, it is not disputed that Mr. Leach received absolutely no money for his participation in Hecker's fraudulent scheme while Hecker himself personally received more than a million dollars.  If the extent to which a defendant shares in the proceeds is a

PDF created with pdfFactory trial version www.pdffactory.com

fact indicative of his or her role in the offense, Mr. Leach was an operative nobody to Hecker's commanding somebody.  *See United States v. Rumbo-Rosendiz*, 340 F.3d 598 (8th Cir. 2003)(defendant possessive of significant amount of criminal proceeds not entitled to role reduction);  *United States v. Hernandez-Pachero*, 334 Fed.Appx. 795 (8th Cir.)(same).   Tracing the flow of criminal proceeds and reviewing how they were apportioned has historically been a good indicator of one's position within a conspiracy and a defendant who possesses a significant amount of criminal cash proceeds is considered more criminally culpable than one who does not.  *See Rumbo-Rosendiz,* 340 F.3d at 600.  Here, where Mr. Leach received none of the proceeds from the fraud, when coupled with Mr. Leach's exodus from the Hecker organization, suggest that a role adjustment is appropriate.

Third, Mr. Leach's role in the instant offense was dictated by Hecker and was not the product of any independent thought or action on Leach's part.  *See United States v. Watt*, 707 F.Supp.2d 149 (D. Mass. 2010).  To the contrary, Mr. Leach exercised not one bit of independent decision making, rather, he followed instruction from Hecker.  In this regard, his role is akin to that of some of the most peripheral actors in a conspiracy, thus, a role adjustment is indicated.

The government and the defendant separately evaluated the facts of this case and correctly determined that Mr. Leach was a minor participant entitled to a two-level reduction in his offense level under the guidelines.  This determination was correct.

PDF created with pdfFactory trial version www.pdffactory.com

## Argument as to the Sentence to Be Imposed

In *United States v. Booker*, 543 U.S. 220, 245-246 (2005), the United States Supreme Court held that mandatory application of the federal sentencing guidelines is unconstitutional, and that the guidelines should be viewed as merely advisory. Post-*Booker* cases in the United States Supreme Court and the Eighth Circuit Court of Appeals address the power and discretion of the district court in fashioning an appropriate sentence. The guidelines remain a factor in sentencing; however, they are just one factor among many the court must consider in determining a sentence that comports with §3553(a)'s parsimony provision to impose a sentence sufficient, but not greater than necessary to accomplish the sentencing purposes set forth in that statute. *See Kimbrough v. United States*, 552 U.S. 85, 90, 111 (2007). In fashioning a sentence that effectuates this statutory command, courts are required to consider the history and characteristics of the defendant. *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009). After *Booker*, the district courts have flexibility to deviate from the advisory sentencing guideline range to "individualize sentences where necessary," and to "tailor the sentence in light of the statutory concerns other than the advisory guidelines." *U.S. v. Maloney*, 466 F.3d 663, 668 (8th Cir. 2006). Indeed, it can no longer be disputed that to blindly impose a guideline sentence and ignore the personal circumstances of the defendant and other mitigating factors would result in a sentence at odds with the command of the legislature. *See United States v. Feemster*, 572 F.3d 455 (8th Cir. 2009).

A sentencing court must consider the following factors as set forth in 18 U.S.C. § 3553(a) in order to arrive at a sentence:

PDF created with pdfFactory trial version www.pdffactory.com

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
(3) the kinds of sentences available;
(4) the advisory guideline range;
(5) any pertinent policy statements issued by the Sentencing Commission;
(6) the need to avoid unwarranted sentence disparities; and
(7) the need to provide restitution to any victims of the offense.

Upon consideration of these factors, the court then must impose a sentence that is sufficient, but no greater than necessary to satisfy the purposes of sentencing, to wit, "just punishment, deterrence, protection of the public and the rehabilitation of the defendant." *United States v. Lupton*, 2009 WL 1886007, *1, 4 (E.D.Wi.). The sentencing judge's responsibility, then, has become to "canvass all of the many features of the case that bear on the culpability of the defendant." *See United States v. Ovid*, 2010 W.L. 3940724, *1, 6 (E.D.N.Y). Some of these features have been considered by the Sentencing Commission, some have not. Nonetheless, this court's consideration must be guided by the overarching explicitly stated command that the ultimate sentence to be imposed should be no greater than necessary to satisfy the statutory purposes of sentencing.

After consideration of all of the mitigating factors in this case, it is clear that a sentence of five years of probation is sufficient to satisfy the statutory purposes of sentencing in this case.

14

A. **The nature and circumstances of the offense and Mr. Leach's history and characteristics favor a sentence below that provided by the advisory guidelines.**

Congress imposes upon this court an obligation to examine the nature and circumstances of the offense and the history and characteristics of the defendant in order to determine the sentence that is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. Several factors unique to this case favor a sentence substantially below that provided by the advisory guidelines.

1. ***Mr. Leach's voluntary withdrawal from the conspiracy and significant efforts at self-rehabilitation justify the sentence he seeks.***

A sentencing variance is justified by Mr. Leach's post-offense acts of withdrawing from the conspiracy and putting forth significant efforts to rehabilitate himself.

*Gall v. United States* is the watershed case on the issue of a variance based on the nature and circumstances of the offense and the characteristics of the defendant. Its facts are compelling and closely parallel those present in the instant case, though arising in a disparate setting.

Brian Gall was a college student and drug user when he began making a lucrative income by distributing ecstasy. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586 (2007). He began his distribution career on a small scale in February of 2000 and ended it several months later after distributing significant quantities of ecstasy to other drug dealers for sale on the street. *See Gall*, 446 F.3d 884, 885 (8th Cir. 2001). Although netting some $30,000 and distributing more than 2,500 grams of ecstasy over seven months, Gall

PDF created with pdfFactory trial version www.pdffactory.com

abruptly stopped using, and then selling, ecstasy. He moved in with a new college roommate and became focused on his major course of study. Thereafter, he graduated from college, got a job, and stayed clean. *Gall*, 128 S.Ct. at 592. In the words of the sentencing judge, Brian Gall had "self-rehabilitated." *Id.*

Two years after his withdrawal from the conspiracy, his checkered past found its way into his exemplary present life: federal agents came to question him in his new home in Arizona regarding his involvement as an ecstasy distributor. He was subsequently charged with possession to distribute more than 2,500 grams of ecstasy. *Id.* With "no significant criminal history," and receiving a reduction for acceptance of responsibility, his recommended guideline sentencing range was 30-37 months. *Id.* at 593.

The judge, however, found that the sentence provided by the guidelines was ill-suited to Gall and his crimes and instead sentenced him to probation for a term of 36 months. The court relied on Gall's voluntary withdrawal from the conspiracy, his post-offense conduct, the support of his family and friends, lack of criminal history, and his age at the time of the offense in arriving at a sentence that addressed and properly balanced the sentencing factors as set forth under 18 U.S.C. §3553. *Id.* at 593. The Government appealed and the district court's decision regarding the appropriate sentence was eventually affirmed in all regards.

PDF created with pdfFactory trial version www.pdffactory.com

**_a.   Steven Leach, like Brian Gall, withdrew from the conspiracy long before any investigation was underway and because of Hecker's refusal to "make it right" with Chrysler Financial._**

Steven Leach represents a defendant similarly situated to Brian Gall in many respects. The disposition in *Gall,* therefore*,* should logically carry significant weight in this court's contemplation of the appropriate sentence.   First, and perhaps most importantly, Steven Leach, like Brian Gall, voluntarily ended his association with the conspiracy of his own free will long before any investigation was underway.   On December 4, 2007, slightly more than two weeks after Hecker presented the false document to Chrysler Financial, Steven Leach quit his job after Hecker refused to "make it right" with Chrysler Financial.   According to those present, Steven Leach then pressed the folder containing the true and correct Hyundai contracts into Hecker's hand and begged him to do the right thing immediately before walking away from a lucrative, stable position within the Hecker organization. Dennis Hecker's refusal to do so, to right this wrong, was the reason Steven Leach left. Steven Leach quit for the right reasons.   If Steven Leach had not entirely self-rehabilitated that day within the meaning of *Gall*, he had taken a large step down the pathway toward redemption.

This factor, Steven Leach's voluntary withdrawal from the conspiracy, is entirely unaccounted for by the bald application of the guidelines.   *See United States v. Ovid*, 2010 W.L. 3940724, *1, 5 (E.D.N.Y)(giving significant weight to factors that were proper considerations under §3553, but that were wholly unaccounted for by application of the guidelines themselves).   Under the Guidelines, there is no reduction from the

PDF created with pdfFactory trial version www.pdffactory.com

adjusted offense level that accounts for this significant mitigating factor. Indeed, Gall's withdrawal from the conspiracy *nearly carried the weight of the entire sentence reduction* he received because it bore directly upon the issues of Gall's criminal culpability and likelihood of recidivating. The sentencing court in *United States v. Lupton*, likewise observed that one who faces up to his conduct and takes the first steps to better his behavior in the future is deserving of less punishment because such actions reflect directly on his criminal culpability and on the likelihood of recidivism. *See United States v. Lupton*, 2009 W.L. 1886007, *1 (E.D. Wis). Likewise, here this court must consider and give significant weight to Mr. Leach's voluntary disassociation from the conspiracy and his coconspirators because it bears directly upon his degree of criminal culpability as well as the likelihood of reoffending.

### b.   *Steven Leach is rehabilitated.*

This court should further consider the fact that Steven Leach, like Brian Gall, took significant steps to create a new life that was consistent with his own personal and professional values and far removed from his prior criminal involvement. Courts have not been hesitant to credit a defendant's efforts at rehabilitation favorably in a §3553 analysis when, as here, it is not merely a "transparent effort to build a mitigation case" following discovery of criminal conduct. *See Gall*, 128 S.Ct. at 601; *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008)(noting that the potential for rehabilitation may provide "grist for the sentencing court's mill").

Following his exodus from Hecker's employ, Steven Leach created his own business venture, SRS, which he conducted with an extraordinary amount of personal and

18

PDF created with pdfFactory trial version www.pdffactory.com

professional integrity. (*See, e.g.,* Ex. 18, letter from Larry Janus). He created a small business where his employees, who have written letters directly to this court, "felt valued as employees and as individuals." (*See* Ex. 2, letter of Kathleen Osterhus). These employees gave examples of what made Steven Leach an extraordinary person to work for, whether it was that he would inquire about each employee's spouse and children by name, or that he was more of a friend than employer during the personal tragedies of life. (*See* Ex. 19, letter of Rene Mewes; Ex. 2, letter of Kathleen Osterhus). It is worth noting that almost every employee of SRS had previously worked with or for Mr. Leach in other circumstances, some of them for decades. They followed him to his new company because of the relationship he carefully cultivated with each person. The significance of the composition of his new work force was not lost on some: "[o]nce on board, I could not get over the number of people that had been with Steve at other companies and welcomed the chance to work with him again. The loyalty and excitement of these people wanting to be a part of this dream company that Steve was starting, impressed me and others in our business." (Ex. 18, letter of Larry Janus). Steven Leach carried himself further down the path of redemption.

Perhaps no story told by his employees better exemplifies Steven Leach's relationship with his "employee family" than the one told by Kathleen Osterhus, an employee who followed Mr. Leach from MarketWise, a company previously owned by Mr. Leach, to SRS:

> One thought that comes to mind illustrates Steve's caring and compassion for others more than any other. While working at MarketWise, one of his employee family lost her young daughter in a traffic accident. The

PDF created with pdfFactory trial version www.pdffactory.com

employee's wish was that the funeral service was befitting her only daughter. Quietly and unknown to most of us, Steve donated the funds necessary to assure that the family's wishes were met. His generosity ensured that Rene's family was not saddled with a financial burden from such a painful and tragic event. He went further and closed the offices so that employees could attend the funeral and pay their respects to her family. (*See* Ex. 2, letter of Kathleen Osterhus).

There are other similar stories that employees have told in their letters to this court. In the end, one is left with the distinct impression that Steven Leach conducted his professional life as he conducted his family life: with a strong personal commitment to each individual in his "family."

Steven Leach's involvement with SRS and his "employee family" continued up until October of 2010. At that time, the business collapsed under the weight of the federal charges against him and he was forced to close it. Steven Leach had, within the words of the court in *Gall*, "forged a new life," even if as in *Gall*, his past criminal acts caught up with his exemplary present life. *See Gall*, 128 S.Ct. at 593.

The sentencing court in *Gall* relied upon Gall's post-offense efforts at rehabilitation in determining that he represented neither a person likely to reoffend nor a danger to society. *Id.* Steven Leach's significant efforts at rehabilitation are entitled to significant weight in the §3553 analysis.

### c.   *Steven Leach is well-supported and loved by this community.*

The final similarity between Steven Leach and Brian Gall lies in the extraordinary support Steven Leach enjoys from the community at large; one to which he has consistently given for years and from which he has asked nothing in return. The character letters provided to the court come from people from all walks of life: from close

PDF created with pdfFactory trial version www.pdffactory.com

family members, to the woman who has cut his hair every four weeks for the last 30+ years, from friends of his for decades to some of the kids, now adults, he used to coach. Steven Leach touched these individuals' lives through the way he gracefully lived his. He has walked a path in his life that most people merely talk about.  He has volunteered literally thousands of hours coaching various girls and boys youth sports for more than 15 years.  From those efforts, more relationships were formed as demonstrated by those letters from former players and their parents.  All of the letters directed to this court set forth instance after instance of Mr. Leach's unselfish giving to individuals in the most unexpected of ways.  A recognition that there was a need for a developmental basketball team and then creating and coaching it; finding housing for an Ecuadorian family new to the Twin Cities; organizing a sport shoe drive for inner city teams after noticing, during coaching, that there was a need:  these are but a few of the dozens of examples of who Steven Leach really is as told by those who wrote to this court.

The letters nearly uniformly discuss how wholly inconsistent Mr. Leach's actions are in the instant case with the individual they have observed living a good, charitable, and family-oriented life.  The stories contained in the more than 100 character letters submitted to the court demonstrate the full breadth of character Mr. Leach possesses and the astonishing level of support he has within this community to which he has so generously given for many years.  This community fully supports him and "once this process is complete, the community will again be made better by Steve's presence."  (*See* Ex. 20, letter of David Walsh).

PDF created with pdfFactory trial version www.pdffactory.com

When coupled with his demonstrated rehabilitation, this familial and community support is a meaningful sentencing consideration. *See United States v. Martin*, 520 F.3d 87, 94 (1st Cir. 2008). Indeed, the court in *Gall* specifically relied upon Gall's support within his community as a part of its decision to vary from the guideline sentence. In a similar vein, the court in *Martin* held that such support coupled with an interpersonal metamorphosis such as the defendant experienced here, gave possibility to "meaningful rehabilitation which rises to the level meriting some weight in the section 3553(a) analysis." *Martin*, 520 F.3d at 94. Such a holding is with good reason: a defendant who demonstrates rehabilitation and has community support to maintain his rehabilitated state represents neither a danger to the community nor an offender who needs significant correcting. In just such a case, the parsimony provision of §3553 may have its greatest significance.

Furthermore, the role of such letters is to provide history and context to the instant criminal charge, not to erase it from existence. The court in *Adelson* observed the significance of a sentencing court's review of the entire life of the defendant as follows:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant.

Mr. Leach's future is in the hands of this court. He asks this court to assess the need for punishment for the instant offense in the context of a life well-lived in which he

PDF created with pdfFactory trial version www.pdffactory.com

has generously given of his time to the community of family, friends, co-workers, prior students, parents, and others and where this same community asks this court for the opportunity to give back their support to Steven Leach *within* their respective community.

2. ***Steven Leach's offense conduct, age, and absence of criminal history suggest he is highly unlikely to re-offend, thus, a sentence of imprisonment is not necessary to protect the public.***

In the plainest of terms, Steven Leach is highly unlikely to reoffend and thus, when coupled with other facts unique to this case, it becomes clear that a period of incarceration is not necessary.

First, his voluntary disassociation from his employment with Dennis Hecker and with his codefendants strongly suggests that he is unlikely to reoffend. In quitting, he disassociated from a community of similarly-situated people who unwittingly, (or not), supported Hecker's questionable business practices by capitulating to his demands without questioning the propriety, or legality of his directives. *See United States v. Lancor,* 2010 W.L. 1780294 (E.D.Wis.)(Basing variance decision in part on fact that defendant's criminal acts were at the behest of her husband and were unlikely to have been committed without his persuasion).

PDF created with pdfFactory trial version www.pdffactory.com

Furthermore, as a person with no prior *arrests,* not to mention convictions, Mr. Leach represents an individual with the lowest rate of probable recidivism. [3] The reconviction rate for an offender like Steven Leach is 2.5%, the lowest for all offenders in all criminal history categories. *Id.* at 14, n. 28. The analysis performed by the Sentencing Commission concludes that the risk of recidivism is lowest for these offenders and is "substantially lower than recidivism rates for other offenders, and even for offenders with only one criminal history point." *See United States v. Watt*, 707 F.Supp.2d at 158, *citing id.* at 13, 17. Furthermore, empirical studies have long established that the older offender with no prior criminal history represents an extremely low likelihood of reoffending. *See* Maxfield, et al, "*Research Series on the Recidivism of Federal Guidelines Offenders, Release 3, A comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score* (2005); *citing* Schmidt and Witte, n. 29. The court in *United States v. Lupton*, granted a variance to the defendant finding the guideline sentence provided punishment that was greater than necessary to protect the public and deter others based in part on the defendant's lack of any prior record. *See Lupton*, *supra* at *10.

This low recidivism rate represents just one more reason for this court to give Mr. Leach a "first second chance."

---

[3] *See* United States Sentencing Commission, Recidivism and the "First Offender" 1, 14 (May 2004)(On the web at http://www.ussc.gov/publicat/recidivism_firstoffender.pdf). The Commission studied so called "first offenders" in the federal system and determined that not all first offenders represent the same risk of recidivism. In its study, the Commission distinguished between individuals who had no prior arrests, had prior arrests that resulted in no adjudication, and those who had convictions which were not counted under the Guidelines. Steve Leach belongs in the first of these classifications which represents the lowest rate of recidivism.

PDF created with pdfFactory trial version www.pdffactory.com

### 3. *The Sentence provided by the guidelines is ill-fitting in this case.*

Of course, this court must consider the United States Sentencing Guidelines in determining what sentence to impose.  What this court may find in the guidelines; however, is an ill-fitting construction that represents neither a sound determination of the Sentencing Commission who constructed it nor *fairly* captures the level of criminality present in offense conduct at issue in this case.

It is by now well established that this court is entirely free to reject the guideline sentence in favor of a sentence that more effectively advances the statutory purposes of sentencing.  This is, after all, the holding of *Booker* and its progeny and represents the remarkable unshackling of a federal court judge's sentencing discretion after years of being tethered to the imposition of the mandatory guideline sentence. The Supreme Court expanded this holding in *Kimbrough,* and reaffirmed it in *Gall*, when it held, in part, that in circumstances where the sentencing commission has not relied upon an empirical basis for establishing a particular guideline range, that a sentencing court has liberal discretion to vary from that guideline range and impose a sentence that comports with the commands of §3553.  *See Kimbrough*, 552 U.S. 85, 109-110 (2007); *Gall*, 552 U.S. 38, n.2.  In such circumstances, the sentence provided by the Guidelines is simply less useful to the sentencing judge because it lacks an anchor to the wisdom of mainstream judicial decision making that was contemplated by the Sentencing Reform Act from its inception. *See Kimbrough*, 552 U.S. at 109-110.  Thus, a guideline range that is not empirically based does not "reflect a rough approximation of sentences that might achieve §3553(a)'s objectives" within the meaning of *Rita*.  *See Rita*, 551 U.S. at 350.

PDF created with pdfFactory trial version www.pdffactory.com

Such is the case here both in terms of the guideline at its inception and during its evolution over time.  The loss guideline that determines the guideline range applicable to Mr. Leach's case is one of those guidelines in which the Sentencing Commission strayed from its empirically-based focus in first establishing a nation-wide, judicially-based guideline range.  *See United States v. Lenagh*, 2009 W.L. 296999, *1, 3-4 (D. Neb.)(noting that for policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guideline ranges for white collar theft crimes); *United States v. Bennett*, 2008 W.L. 2276940, *1, 4 (D. Neb.)(same, *dicta*).  Thereafter, instead of canvassing the various court systems and following the tenor of judicial decision making, the sentencing commission instead capitulated to outside pressures to significantly increase the guideline range for fraud offenses in a series of amendments. *See* Parker, Jeffrey and Block, Michael, *The Limits of Federal Criminal Sentencing Policy; or, Confessions of Two Reformed Reformers*, 9 Geo. Mason L.Rev. 1001, 1019 (2001).  What used to be routine probationary offenses have become lengthy prison sentences for no reason based in the institutional practice of the federal courts, but rather were "essentially political decisions reflecting responses to interest group pressures." Parker & Block, *supra*, at 1019.  It is in just such circumstances that a prudent sentencing court may find that the guideline sentence is ripe for variance because the guideline sentence is greater than necessary to achieve §3553(a)'s purposes.  *See Kimbrough*, 552 U.S at 110.

Furthermore, there is good reason to question the application of the fraud guideline in the instant case beyond those questions raised by its non-empirically-based

PDF created with pdfFactory trial version www.pdffactory.com

origin and development over time. The offense conduct here is almost entirely driven by the amount of loss in this case, but the real question remains:  what is the relationship of the loss figure to issues raised in 18 U.S.C. §3553(a)?"  *See United States v. Watt*, 707 F.Supp.2d 149, 155 (D.Mass. 2010). As the court observed in *Watt*, while loss is effectively a proxy for evaluating culpability, it does not always yield an accurate measure.  *See id.*  Where there is a significant chasm between loss to a victim and gain to the defendant, loss may not be an appropriate measure of criminal culpability.  *See id.* (suggesting that drafters of theft guideline believed loss was an appropriate measure of criminal culpability because it measured both harm to the victim and gain to the defendant.); *see also United States v. Lenagh*, 2009 W.L. 296999, *1, 3-4 (D. Neb.)(loss is not always a reliable proxy for the culpability of an individual defendant where loss to the victim and gain to the defendant are at variance).   In such circumstances, where the loss to the victim is grossly disproportionate to the gain to the defendant, loss can "overstate both the degree of the defendant's criminality and his need to be corrected. *See United States v. Costello*, 16 F.Supp.2d 36, 38-39, (D. Mass. 1998), *quoting*, *United States v. Stuart,* 22 F.3d 76, 82 (3rd Cir. 1994).

The court in *United States v. Costello*  held as much in a slightly different context when it approved a downward departure for a defendant who was a bit player in a scheme to fence stolen property and his cut of the proceeds, roughly 1%,  reflected as much.  *See Costello*, 16 F.Supp.2d 36, 38-39, (D. Mass. 1998).  There, the court stated that the *extent* of disproportionality between the loss to the victim and the gain to the defendant was

PDF created with pdfFactory trial version www.pdffactory.com

precisely the "question of 'degree' not 'kind' suggested by the language of 18 U.S.C. §3553(b)" that may give rise to a sentencing variance. *See Costello*, 16 F.Supp.2d at 39. The court in *United States v. Lenagh* similarly concluded that where loss to the victim was $1.4 million but the defendant only received $95,000 of that amount, holding her responsible for the total loss vis-à-vis the loss guideline exaggerated her criminal culpability. *United States v. Lenagh*, 2009 W.L. 296999, *1 (D. Neb.).

Likewise, here, loss to the victim is a poor measure of criminal culpability.  It fails to account for the fact Steven Leach gained nothing from the fraud, inadequately reflects his overall role as a "bit player" and fails to capture the fact that his actions were undertaken solely at the direction of Hecker.  It is in just such circumstances that the court may, and in this case *should*, reject the sentence provided by the guidelines in favor of a sentence which appropriately captures the significant mitigating factors involved in the commission of this offense and that relate to the specific defendant before this court for sentencing.  It is precisely this kind of guideline infirmity which our own Supreme Court anticipated could lead a sentencing court away from a guideline sentence and toward a thoughtful application of Section 3553's sentencing factors.

### 4. *Mr. Leach's ability to pay restitution will be inhibited by a prison term.*

A guideline sentence will significantly inhibit Mr. Leach's ability to pay restitution in this matter.

This court must consider the defendant's need to pay any restitution that will be imposed in determining the appropriate sentence.  18 U.S.C. §3553(a)(7).

PDF created with pdfFactory trial version www.pdffactory.com

The restitution in the present case is expected to be considerable, even providing for apportionment between the defendants.[4]  Admittedly, the ability of this defendant to pay full restitution is limited by his present financial resources, his earning capacity as an individual who is presently 55 years old, and his felony conviction.  A guideline sentence in the present case would effectively ensure that restitution would never be paid.

And thus, this court must give serious consideration to Mr. Leach's need to pay a sizable restitution award, along with all the other mitigating factors in this case, in arriving at a sentence.  Courts have often considered and given considerable weight to the defendant's need to pay a substantial restitution award when that fact is present along with other mitigating factors in a case.  *See United States v. Watt*, 707 F.Supp.2d 149, 158 (D. Mass. 2010)(Two years in prison when guidelines called for 60 months based on combination of factors including substantial restitution and impact of a high profile felony prosecution); *United States v. Adelson*, 441 F.Supp.2d 506, 515 (D.S.D.N.Y. 2006)(42-month prison term when guidelines called for life where order of full restitution of $50 million served important retributive function).

This court should consider the fact that Mr. Leach will likely be paying toward the restitution award in this case for the remainder of his life in determining what sentence is sufficient, but no greater than necessary to satisfy the statutory purposes of sentencing.

---

[4] This court, of course, has the statutory authority to apportion restitution between these defendants. Mr. Leach would respectively suggest that apportionment would be appropriate in this case with Hecker bearing the majority of the weight of a $14 million restitution order. Irrespective of the eventual apportionment, however, restitution will be considerable.

PDF created with pdfFactory trial version www.pdffactory.com

## <u>A SENTENCE OF FIVE YEARS OF PROBATION IS A SENTENCE THAT IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO EFFECTUATE THE STATUTORY PURPOSES OF SENTENCING.</u>

If ever a case set forth a pattern of significant mitigating factors counseling a non-guideline sentence, this is that case.  While no one fact of this case, standing alone, would prompt this court to sentence the defendant to a term of probation, the numerous mitigating facts of this case suggest that such a disposition would be appropriate.  This is one case where the whole is greater than the sum of its parts and where "the complex of factors—their presence in combination—verges on unique."  *See United States v. Martin*, 520 F.3d at 95.

Having provided the court with ample reasons why a non-guideline sentence is appropriate, the remaining question is, what sentence is sufficient, but no greater than necessary to comply with the purposes of sentencing outlined in 18 U.S.C. § 3553.  Mr. Leach respectfully suggests that a sentence of five years of probation with a period of home confinement and other conditions plus restitution would satisfy the statutory purposes of sentencing.

First, it is important to observe that Congress has chosen not to require a sentence of imprisonment for the offense to which Mr. Leach entered a guilty plea.  As this court is well aware, Congress has elected in some circumstances to require a period of incarceration for some offenses, but not others.  *See* 18 U.S.C. §3561.   The fact that Congress has elected not to require a prison sentence in this case is at least some indication of the legislature's evaluation of the seriousness of this offense.  We must then

PDF created with pdfFactory trial version www.pdffactory.com

turn to what sentence is appropriate pursuant to the application of a different federal statute, to wit, 18 U.S.C. §3553 as it has been applied by various federal courts in the post-*Booker* world.

In *Gall*, the most apt example of a factually similar case, the defendant's guideline range was 30-37 months and he received a sentence of 36 months of probation. *Gall*, 128 S.Ct. at 593.   Such a variance from a guideline sentence is prevalent in the post-*Booker* world of sentencing discretion.   *See United States v. Howe*, 543 F.3d 130 (probationary sentence where Guidelines called for 18-24 month sentence); *United States v. Tomko*, 562 F.3d 558, 573 (3rd Cir. 2008)(Defendant sentenced to three years of probation where advisory Guidelines called for 12-18 months); *United States v. Carter,* 538 F.3d 784 (7th Cir. 2008)(Sentence of 24 months imposed in fraud case where guidelines called for 87-108 months); *United States v. Lupton*, 2009 W.L. 1886007, *1, 10 (E.D.Wis. 2009)(Sentence of 24 months imposed in bribery and fraud case where guidelines called for 41-51 months); *United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006)(Sentence of 42 months imposed in fraud case where guidelines provided life sentence); *United States v. Gardellini*, 545 F.3d 1089, 1094, n. 5 (D.C.Cir. 2008)(collecting cases).

In the present case, Mr. Leach's advisory guideline sentence under the plea agreement is 37-46 months.   Based on those cases cited within this sentencing memorandum, Mr. Leach requests that the court sentence him to a sentence of five years of probation along with a period of home confinement, restitution and other conditions. This variance from the guideline sentence is justified by a combination of mitigating facts

PDF created with pdfFactory trial version www.pdffactory.com

unique to this case, to wit, his voluntary withdrawal from the conspiracy, his post-offense rehabilitation, the astonishing level of support he has within the community, and his complete and utter lack of criminal history and attendant, extremely low probability of reoffending.  Such a sentence also maximizes the likelihood that substantial restitution could be made to the victim of this offense.

Finally and importantly, a sentence of probation is hardly a slap on the wrist. Indeed, the United States Supreme Court recognized that a sentence of probation represents a "substantial restriction of freedom."  *Gall*, 128 S.Ct. at 593.  In this regard, the district court in *Gall* observed:

> [Gall] will have to comply with strict reporting conditions along with a three year regime of alcohol and drug testing.  He will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court.  Of course, the defendant always faces the harsh consequences that await if he violates the conditions of his probationary term.  *Gall*, 128 S.Ct. at 595.

For an individual like Mr. Leach who has never had any contact with the court system prior to the instant offense, a sentence of probation represents a significant sentence. The sentence he seeks in this case is a sentence of five years of probation, a sentence which is well supported proportionately and logically by *Gall* and its progeny.  Such a sentence also represents a lengthy period of intense supervision over Mr. Leach's life which will be followed by a period of supervised release.  In the event that Mr. Leach chooses a life that is inconsistent with the changes he has made in the last three years, this court can, and most assuredly would, commit Mr. Leach to a term of imprisonment.

PDF created with pdfFactory trial version www.pdffactory.com

Giving him a first "second chance" by sentencing him to a probation sentence is both called for under the unusual facts of this case and an appropriate balancing of those sentencing factors identified by Congress as mandated to guide this court's considerable discretion.

## CONCLUSION

"Seek wisdom to temper justice with compassion" is a phrase accompanying a sculpture of the Angel of Mercy speaking to Lady Justice at Cumberland School of Law in Birmingham, Alabama.  Mr. Leach and the many people who took time to write to this court expressing their high regard for him, request that this court do just that:  exercise justice tempered with mercy.

For the foregoing reasons and those to be set forth in argument at the sentencing, Mr. Leach asks this court to sentence him to five years of probation, with a period of home confinement, restitution as determined by the court, and other conditions.

Respectfully submitted,

Dated:  December 22, 2010

/s/ Robert D. Sicoli
Robert D. Sicoli, #178238
Law Offices of Robert D. Sicoli, Ltd.
310 Fourth Avenue S., Suite 8000
Minneapolis, MN 55415
Telephone:  (612) 871-0708

Sarah M. MacGillis, #282017
MacGillis Law, P.A.
310 Fourth Avenue S., Suite 8000
Minneapolis, MN 55415
Telephone:  (612) 455-1034

Attorneys for Defendant

PDF created with pdfFactory trial version www.pdffactory.com