UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 10-32(2)(JNE)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>STEVEN JOSEPH LEACH,<br><br>        Defendant. | **POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING** |

The United States of America, by and through its undersigned counsel, hereby submits its position with respect to sentencing in the above-captioned case. The United States asks the Court to sentence defendant Steven Joseph Leach to a term of imprisonment of 37 months, the low end of the range negotiated in the plea agreement.

## INTRODUCTION

The United States has reviewed the Presentence Investigation Report (PSR) prepared in this case and adopts the findings of the report, except the government disagrees with the PSR's finding that the defendant should not receive a two-level mitigating role reduction. The parties anticipated such a reduction, along with the resulting guideline range of 37 to 46 months imprisonment, rather than the 46 to 57 month range calculated in the PSR. The parties do not dispute any other guideline issue or the PSR's restitution amount. The PSR calculated total restitution owing to

Chrysler Financial in the amount of $16,261,871.91.  PSR, ¶¶ 34, 86.

## STATEMENT OF FACTS

Although Dennis Hecker was famous for owning a large number of automobile dealerships, the focus of the criminal case against Hecker and Steven Leach was on Hecker's leasing entities.  The leasing entities operated under a variety of names, including Rosedale Leasing and Walden Leasing (hereinafter, collectively "Rosedale/Walden").  They were essentially one company with one mission: to acquire large groups of fleet vehicles and lease them to rental car companies.  Rosedale/Walden was generally among the most profitable of Hecker's entities, with some witnesses calling it the "cash cow" of the Hecker organization.

Leach started at Rosedale/Walden in about 1987 and was either the president or a vice president until late 2007, when he quit after assisting Hecker in the Hyundai fraud scheme.  Over that approximately 20 year period, Leach was a critical player for Hecker, and he was compensated well.  By the latter years, he was earning upwards of a $1 million a year, including bonuses that were based on the number of cars he acquired for Rosedale/Walden.  Thus, he was, after Hecker, the most highly compensated person working for Hecker.

Moreover, from about 1998 through 2006, Leach had another business, Marketwise Solutions, that he either owned or for which

he served as president.  Witnesses indicated that, because Leach was so crucial to Hecker, not only did Hecker compensate him highly, but Hecker also permitted Leach to have a side business.

Given Leach's position within the company, it is not surprising that Hecker tapped Leach to assist with the Suzuki and Hyundai fraud schemes.  Moreover, given that Leach willingly assisted in the Suzuki scheme, it is also not surprising that Hecker assumed Leach would be willing to assist with the very similar Hyundai scheme.

The Suzuki scheme came first.  For several years in a row, including 2006 and 2007, Leach was involved in duping Chrysler Financial, Hecker's biggest lender, with respect to financing Suzuki vehicles.  Leach was the key individual involved because, as president of Rosedale/Walden, he negotiated the contract with American Suzuki Motor Corporation ("Suzuki Motor") to purchase the Suzuki vehicles.  On the back end, he also oversaw Rosedale/Walden's efforts to obtain financing for the Suzuki vehicles from Chrysler Financial.

In 2006 and 2007, both Leach and Hecker made sure employees did not provide Chrysler Financial with a true copy of the actual purchase contract that Leach negotiated with Suzuki Motor.  Both he and Hecker had employees fraudulently alter the contract so that Chrysler Financial had no idea Rosedale/Walden received lucrative incentive money from Suzuki Motor.  The incentive amount was

3

upwards of $5,000 per car, and when multiplied by the large number of cars, was in the millions of dollars each year of the scheme. By fraudulently altering the Suzuki purchase contract, Rosedale/Walden was able to keep that incentive money, rather than turning it over to Chrysler Financial. If Chrysler Financial had known the truth about the incentive money, they would have insisted on receiving it as part of early loan repayments.

Presumably, Leach hoped Rosedale/Walden would repay Chrysler Financial the total amount of money it borrowed, so that the fraud would never be discovered. But when things turned south, as they eventually did, the end result was a loss amount to Chrysler Financial. Even if Leach hoped Chrysler Financial would be repaid, he still knowingly participated in a scheme to defraud Chrysler Financial. Thus, his crime is no different from someone who blatantly steals money, all while promising himself that he will later repay the money.

Given that Leach held the position of president of the leasing operation, he knew that the lies to Chrysler Financial were material. The Suzuki cars, the collateral for the financing, were not worth nearly as much as Hecker and Leach said the cars were worth. The $5,000 or so per car incentive amount directly cut into the repurchase guarantee that Suzuki Motor promised it would pay Rosedale/Walden, after the Suzuki cars were taken out of rental service. Thus, Chrysler Financial was at risk of not getting at

least that $5,000 back in repayment of its loan. And, the $5,000 per car "cash back" incentive meant the cars did not cost Rosedale/Walden nearly as much money as they told Chrysler Financial the cars cost. By analogy, it was as if a person borrowed $100,000 for a house that really only cost $90,000 because of a side payment at closing of $10,000. The lender was at risk of losing the difference, but it also had been lied to about the total value of the house.

At Hecker's and Leach's direction, Rosedale/Walden employees altered the Suzuki contract by cutting out the critical information about the incentive information. Sometimes they renumbered the pages to help mask the fraud; sometimes they went into the Word version, deleted text, and moved up the signature page so it was harder to tell that text had been removed. But in every case, the document that was sent to Chrysler Financial was incomplete and different from the real contract; that is, it was a fake, and Leach knew it was a fake, year after year.

The Hyundai fraud scheme, which took place in the fall of 2007, was similar to the Suzuki fraud scheme in that it, too, involved a fake document supplied to Chrysler Financial to get financing. Just as with the Suzuki scheme, the fake document at issue was an automobile purchase contract. Just as with the Suzuki scheme, Leach was the critical person who negotiated the true contract, although this time it was with Hyundai Motor America

5

("Hyundai Motor"). Just as with the Suzuki scheme, Leach was also critical because again he was in charge of all the employees whose assistance was necessary to further the fraud. And again, the purpose of the fraud scheme was to lie to Chrysler Financial about the true terms of the deal struck with the car manufacturer, so that Rosedale/Walden could keep millions of dollars in incentive monies. And just as with the Suzuki scheme, Chrysler Financial was at great risk because its collateral, the cars, were not worth nearly as much as Hecker and Leach represented they were. Ultimately, when Hecker's empire came crashing down, Chrysler's increased risk (which Leach and Hecker hid) ultimately resulted in a real loss to Chrysler Financial. On the Hyundai fraud scheme alone, that loss exceeded $14 million.

The similarities between the Hyundai and Suzuki fraud schemes are important because, in the government's view, they demonstrate Leach's pattern of fraudulent behavior. That is, Leach was for several years in a row a willing participant in fraudulently altering documents to secure financing. Thus, although it is noteworthy that Leach eventually decided he could no longer participate in the Hyundai fraud, Leach was otherwise willing to assist in similar fraudulent conduct, involving Suzuki vehicles, over the course of years. As far as the government is aware, Leach never expressed any concern or qualms about participating in the Suzuki fraud scheme.

Moreover, there are other aggravating facts. From the government's evidence, in the fall of 2007, Leach assisted in the Hyundai fraud scheme, albeit at Hecker's direction, for a number of weeks. He may not have been happy about it, it may not have been his idea, but he was most certainly going along with the fraud, and he was actively involved in pulling other Hecker employees into assisting in the fraud.

Unlike those employees, each of whom was compartmentalized, Leach as president of the leasing organization was fully aware of all aspects of the fraud. He was the primary negotiator with Hyundai Motor, and thus he knew that the majority of the cars were "risk" cars, that is, the cars had no guarantee that Hyundai Motor would repurchase them at the end of their rental car service. Unbeknownst to Chrysler Financial, the cars were merely subject to the ups and downs of the used car wholesale market, and when that market later tanked quite severely, Chrysler suffered millions in losses.

As president, Leach was also in charge of ordering the cars from Hyundai Motor, and he was in charge of obtaining the financing from Chrysler Financial. From this backdrop, Leach told a Hecker employee to order the cars from Hyundai Motor as "risk" but to treat the cars internally, on other paperwork and within internal systems, as if they were "repurchase." This was the heart of the fraud. The cars had to be ordered correctly (as "risk") because

Hyundai Motor, the car manufacturer, certainly knew what they were. But by mislabeling the cars internally (as "repurchase"), Leach knowingly set in motion a series of events that resulted in Rosedale/Walden employees preparing financing paperwork that showed the cars as "repurchase." Under Leach's direction, that paperwork was sent to Chrysler Financial for financing, and Chrysler Financial arranged to provide roughly $80 million in financing, incorrectly assuming most of the cars had the valuable "repurchase" guarantee when they did not.

Leach set the critical chain of events in motion over the course of several weeks, all before November 15, 2007. It was on that date that Hecker asked Leach to prepare a "cut and paste" Hyundai purchase contract. They needed to create the false document because Chrysler Financial was demanding the contract. Chrysler Financial had already been lied to and asked to finance nearly 5,000 Hyundai "repurchase" vehicles, and it wanted to see in black and white the actual repurchase guarantee for all these vehicles. Hecker, having already initiated the fraud, was in a bind. He called on Leach, and Leach delivered. Hecker took the real purchase contract (which covered only about 600 "repurchase" cars) and handwrote language to increase the number to 4,855 "repurchase" vehicles. Hecker asked Leach to have an assistant retype this false information onto an insert and then cut out that insert, tape it over the real contract, and then fax it to Hecker

in Detroit, Michigan, where he was meting with Chrysler Financial representatives. Leach, who had already been assisting Hecker with the fraud for weeks, agreed and instructed the assistant to do the cut and taping, and he arranged to have the altered document faxed to Hecker in Detroit.

In the same time frame, a high level employee who reported to Leach and who had been assisting with aspects of the fraud, approached Leach to express his concern about the apparent fraud on Chrysler Financial. Leach had told this employee, whom he had known for years, about the altered document, as well as about the approximately $13 million in incentive money that had flowed into the Hecker organization but about which Chrysler Financial knew nothing. In response to learning this information, this employee told Leach that he could no longer work for Hecker and was resigning.

Leach himself was contemplating quitting, and he had seen his financial advisor to see if he could afford to quit. He also had spoken with at least two attorneys, a civil attorney and a criminal attorney. When the other employee indicated to Leach on December 4, 2007, that he intended to quit immediately, Leach said that they should quit together. They tendered their resignation that day. The other employee ceased any involvement with Hecker, but Leach, who did not return to the office, did continue to assist Hecker for several weeks on a number of things, including issues relating to

9

negotiations with Suzuki.

After leaving Hecker permanently, Leach went to work at his own firm, Strategic Remarketing Solutions, where his biggest client was Suzuki Motor, and where he worked directly on remarketing matters for cars that had been purchased by Hecker from Suzuki Motor and financed by Chrysler Financial (and later, other lenders, based on fraud.

After Leach formally left the Hecker organization, Hecker and others continued the Hyundai and Suzuki fraud schemes, including efforts to minimize the loss and risk of discovery by refinancing portions of the Hyundai fraud cars with Hyundai Capital America.

Although Leach did not formally withdraw from the conspiracy as that term is legally defined, he did stop his involvement in the fraud at the time he left the organization.  Leach did not, however, report the fraud to law enforcement, even when given the opportunity to do so by the Minnesota State Patrol who reached out to Leach in July 2009.

## **MITIGATING ROLE REDUCTION**

In their plea agreement, the parties agreed that Leach was entitled to a two-level mitigating role reduction pursuant to U.S.S.G. § 3B1.2(b).  Importantly, the government did not agree that Leach was entitled to a four-level reduction as a minimal participant.  Instead, it agreed that Leach was "less culpable than most other participants, but whose role could not be described as

minimal." Appl. Note 5 to U.S.S.G. § 3B1.2.

The government stands by the plea agreement and continues to believe that Leach is entitled to a mitigating role reduction based in large part on the comparison between Leach and Hecker, who was by far and away the biggest participant. From the government's investigation, all indications were that both the Hyundai and Suzuki fraud schemes were Hecker's idea, and Hecker directed Leach and others to participate, although Leach willingly did so. Moreover, Leach did not gain anything personally from the fraud itself, in contrast to Hecker, who was able to secure and keep large incentives, at least some of which could be traced to him personally.

Ultimately, in the government's view, what tipped the scale in favor of the mitigating role reduction was Leach's decision to quit the Hecker organization, albeit after assisting with the Hyundai fraud. While that fact cannot negate the other facts of Leach's participation, which is why he was prosecuted, it does weigh heavily in favor of considerations of Leach's mitigating role. By comparison, Hecker, with the help of others, continued the Hyundai and Suzuki fraud schemes for at least a year after Leach resigned, by expanding the schemes to other lenders beyond Chrysler Financial and by covering up and concealing the schemes.

**SENTENCING RECOMMENDATION**

In addition to calculating the applicable guidelines range, in sentencing the defendant, the Court must assess the sentencing factors under 18 U.S.C. §3553(a).  The factors include the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims.  18 U.S.C. § 3553(a).

Considering all appropriate factors, a 37 month prison sentence is a fair and reasonable sentence.  The sentence is at the low end of the guideline range calculated by the parties, and is lower than the range set forth in the PSR.  A 37 month sentence would be sufficient but not greater than necessary to accomplish the federal sentencing goals in this case.

First, the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the offense should warrant a sentence of 37 months in prison.  This sentence already contemplates a two-level reduction for various mitigating factors pertaining to Leach's role, such as the fact that Leach was acting at Hecker's direction and Leach ultimately quit over the

fraud. Leach should not receive any further reduction for those and similar factors, however.

As the facts discussed above demonstrate, Leach willingly participated in two large-scale fraud schemes involving millions of dollars. One of the schemes, the Suzuki scheme, took place over the course of years, and Leach seemingly participated without hesitation. Leach's involvement in the other scheme, the Hyundai fraud scheme, was of shorter duration, but Leach's fraudulent assistance took place over the course of weeks and involved numerous key aspects, including an internal fraud piece that necessarily involved the potential corruption of others (lying to or asking employees to lie) as well as the external piece (lying to Chrysler Financial). Both schemes involved the rather graphic aspect of altering and manipulating documents. Both schemes were undoubtedly directed by Hecker, but both required the willing participation of Leach, the president of the business unit involved. If Leach had said no, the schemes likely could not have gone forward. The ultimate principal and interest unpaid loan amount for which Leach should be held responsible is over $14 million, but the total amount of financing secured by the fraud is many times that number. In any case, these were complex and large fraud schemes, and Leach played an important role in them.

Second, a 37 month sentence is necessary to promote respect for the law, provide just punishment, and afford adequate

deterrence. Leach quit, but he did so only after participating in not one but two fraud schemes. His punishment should not be nearly as severe as Hecker's but it should be sufficient to reflect Leach's own conduct. And unlike whistle-blowers and cooperators whose conduct assisting law enforcement might entitle them to a sentence reduction and other consideration, Leach did none of those things.

Finally, the history and characteristics of this defendant fully support a 37 month sentence. Leach worked for Hecker for over 20 years. Thus, Leach's eyes were more than open as to how Hecker operated, based on Leach's access to Hecker and his high level position as president of the leasing organization. Leach enjoyed substantial compensation, receiving more money than anyone else in the operation, save Hecker himself. Leach even had his own business on the side during much of that time. Leach was not forced by economic circumstances to put up with Hecker. Instead, he could have chosen to leave Hecker at any time, including the first time Hecker raised the issue of altering the Suzuki contract. Thus, given Leach's background, which is distinguishable from so many defendants who appear before this Court, he should be held to a higher not lesser standard. He had the education and experience to make the right choices, and he had more than ample resources to resist temptation. Yet he chose to go along with Hecker's schemes for the money. A 37 month sentence, a sentence likely

substantially less than his co-defendant will receive for devising and participating in the same fraud schemes, is appropriate, fair and reasonable.

## **CONCLUSION**

For all these reasons, the United States respectfully requests a sentence of 37 months imprisonment, along with a restitution order in the amount of $16,261,871.91. The United States will also respectfully request that the Court issue an order requiring the defendant, his wife, their relatives, partners, businesses, attorneys, assigns, and all others in privity with them to release and transfer unconditionally to the United States, for payment of the defendant's restitution obligation, their interest in the funds and property previously frozen by the Court's prior order.

Dated: December 22, 2010          Respectfully submitted,

                                  B. TODD JONES
                                  United States Attorney

                                  s/Nicole A. Engisch

                                  BY: NICOLE A. ENGISCH
                                      NANCY E. BRASEL
                                      DAVID M. GENRICH
                                  Assistant United States Attorneys